Filed 3/13/15

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| THE PEOPLE, | C075255 |
| Plaintiff, | (Super. Ct. No. 13F03215) |
| v. | |
| JOSEPH BREWER | |
| Defendant and Respondent; | |
| STATE DEPARTMENT OF STATE HOSPITALS, | |
| Objector and Appellant. | |
| [AND 16 OTHER CASES*] | |

---

\* People v. Juan Harrison (No. 13F03657); People v. Chaderick Ingram (No. 12F06567); People v. Pathom Ketphanh (No. 13F01635); People v. Daniel Maciuca (No. 13F02539); People v. Don Clemens (No. 13F04065); People v. Tony Cooper (No. 13F03283); People v. Christopher Dargen (Nos. 09F08924, 11F05776, 13M02488); People v. Timothy Dobrinen (No. 13F03068); People v. Gregory Gunter (No. 13F03155); People v. Troy Charles (No. 13F03363); and People v. Gary Wright (Nos. 11F00627, 12F00076, 12F05014, 13F02691).


1

APPEAL from a judgment of the Superior Court of Sacramento County, Steve White, Judge. Reversed with directions.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Senior Assistant Attorney General, Ismael A. Castro and Lisa A. Tillman, Deputy Attorneys General, for Objector and Appellant.

Paulino Duran, Public Defender, Steve Lewis, Chief Assistant Public Defender, and Arthur L. Bowie, Supervising Assistant Public Defender, for Defendant and Respondent.

When a criminal defendant is found mentally incompetent to stand trial (IST), the trial court orders such defendant to be delivered by the sheriff to a state hospital or other treatment facility for treatment to restore the defendant to mental competence, or places the defendant on outpatient status. (Pen. Code, § 1370, subd. (a)(1)(B)(i).)[1]

In 2005, the Sacramento County Public Defender (the Public Defender) filed a petition for writ of habeas corpus on behalf of David Osburn and others, contending the Sacramento County Sheriff (the Sheriff) had unlawfully detained petitioners at the county jail by failing to transfer them on a timely basis to a state hospital for restorative treatment. After several rounds of briefing, and an evidentiary hearing, the trial court issued an order (the Osburn Order) commanding that the Sheriff deliver to Napa State Hospital (NSH) all criminal defendants ordered committed to NSH pursuant to section 1370 within seven days of the commitment. The Osburn Order was amended to require the prisoners' delivery within seven days or as soon as the packet of documents required under section 1370 (the 1370 packet) was available. There was no appeal from the Osburn Order.

In 2013, the Public Defender sought an order to show cause for contempt, alleging the Sheriff had violated the Osburn Order by holding several defendants who had been

_____

[1] Further undesignated statutory references are to the Penal Code.

2

found IST at the jail rather than timely transferring them to NSH. In response, the State Department of State Hospitals (the Department) moved to set aside the Osburn Order. The trial court denied the motion but modified the Osburn Order to extend the 7-day deadline to 14 days. The Department appealed from this 2013 order "denying [the Department's] motion to set aside the transfer deadline established by this Court" in the Osburn Order.

On appeal, the Department contends (1) the trial court acted in excess of its jurisdiction, and violated the separation of powers doctrine, by inserting a 14-day deadline into section 1370 and thereby undermining the Department's duties; (2) the original Osburn Order and the 2013 modification were contrary to established habeas procedures and constituted improperly promulgated local rules; and (3) the Osburn Order should be set aside due to changes in the law and because it results in unequal treatment of defendants found IST in different counties.

We view the Osburn Order as an injunction (as did the trial court) and the Department's 2013 motion to vacate as a motion to dissolve the injunction. Such a motion can be granted upon a showing of a change in the facts, a change in the law, or because the interests of justice so require. (Civ. Code Proc., § 533.) During the pendency of this appeal, there was a material change in the law. Recent amendments to section 1370 and other statutes affect various aspects of the Osburn Order. Accordingly, we remand the matter to the trial court to reconsider its ruling on the Department's motion in light of the change in the law, and to conduct a new evidentiary hearing. We dissolve the Osburn Order pending reconsideration of the ruling.

## BACKGROUND

*The Statutory Scheme for and the Constitutional Rights of IST Defendants*

If at any time before judgment in a criminal trial a doubt arises as to the defendant's mental competence, the court shall order a hearing into the present mental competence of the defendant. (§ 1368.) If the defendant is found mentally competent,

3

the criminal process shall resume.  (§ 1370, subd. (a)(1)(A).)  "If the defendant is found mentally incompetent, the trial, the hearing on the alleged violation, or the judgment shall be suspended until the person becomes mentally competent."  (*Id*., subd. (a)(1)(B).)

"In the meantime, the court shall order that the mentally incompetent defendant be delivered by the sheriff to a state hospital," or other approved available treatment facility that "will promote the defendant's speedy restoration to mental competence."  (§ 1370, subd. (a)(1)(B)(i).)  Alternatively, the court may order the defendant placed on outpatient status.  (*Ibid*.)  Before a court makes a commitment order to a state hospital, the court shall order the community program director, or his designee, to evaluate defendant and submit to the court, within 15 judicial days, a written recommendation as to whether the defendant should be committed to a state hospital or other treatment facility or required to undergo outpatient treatment.  (§ 1370, subd. (a)(2).)

The court is also required to provide the 1370 packet.  These documents include the commitment order, a computation of defendant's maximum term of commitment and amount of credit for time served, criminal history information, arrest reports, any court-ordered psychiatric examination or evaluation reports, the community program director's placement recommendation, records of any finding of incompetence arising out of a complaint charging a felony specified in section 290, and medical records.[2]  (§ 1370, subd. (a)(3).)

Once the defendant has been admitted to a state hospital, a progress report on his restoration to competence is required.  "Within 90 days of a commitment . . ., the medical director of the state hospital or other treatment facility to which the defendant is confined shall make a written report to the court and the community program director for the

---

[2]  As we discuss *post*, the Legislature recently added medical records to the list of documents required to be included in the 1370 packet.

county or region of commitment, or a designee, concerning the defendant's progress toward recovery of mental competence." (§ 1370, subd. (b)(1).)

In *Jackson v. Indiana* (1972) 406 U.S. 715, 738 [32 L.Ed.2d 435, 451] (*Jackson*), the United States Supreme Court held "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." (Fn. omitted.)

The next year, our Supreme Court reviewed "the constitutionality of the procedures ([§ 1367 et seq.]) for the commitment to, and release from, state hospital of defendants in criminal cases who have been found to lack sufficient mental competence to stand trial." (*In re Davis* (1973) 8 Cal.3d 798, 801, fn. omitted (*Davis*).) The court concluded that petitioners' initial commitments were proper, but "acknowledge[d] that some provision must be made to assure that petitioners do not face an indefinite commitment without regard to the likelihood that they will eventually regain their competence, for such an indefinite commitment has been held to offend constitutional principles of equal protection and due process. [Citation.] [¶] Accordingly, we adopt the rule of the *Jackson* case that no person charged with a criminal offense and committed to a state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future. Unless such a showing of probable recovery is made within this period, defendant must either be released or recommitted under alternative commitment procedures." (*Ibid.*)

5

Following *Davis,* section 1370 was amended to provide for a maximum period of confinement of three years for defendants found IST.  (Stats. 1974, ch. 1511, § 6, p. 3319.)  Section 1370, subdivision (c)(1), provides as follows:  "At the end of three years from the date of commitment or a period of commitment equal to the maximum term of imprisonment provided by law for the most serious offense charged in the information, indictment, or misdemeanor complaint, or the maximum term of imprisonment provided by law for a violation of probationer mandatory supervision, whichever is shorter, but no later than 90 days prior to the expiration of the defendant's term of commitment, a defendant who has not recovered mental competence shall be returned to the committing court.  The court shall notify the community program director or a designee of the return and of any resulting court orders."

In *In re Mille* (2010) 182 Cal.App.4th 635 (*Mille*), another appellate court addressed the claim that an 84-day delay in transferring an IST defendant from the county jail to the state hospital was unlawful.  The court focused on the requirement in section 1370, subdivision (b)(1), that the medical director of the state hospital report to the court within 90 days of commitment on the defendant's progress toward recovery of mental competence.  (*Mille,* at p. 645.)  "When a defendant arrives at Patton [State Hospital] on day 84 of the 90-day period, there is no meaningful opportunity for the defendant to make progress toward recovery of mental competence, let alone for the medical director of the hospital to make a written report to the court concerning such progress by the defendant." (*Ibid*.)

The court rejected the argument that the defendant was receiving appropriate treatment at the jail, which was a designated treatment facility under section 1369.1 and thus able to provide antipsychotic medications.  It found that providing a defendant with antipsychotic medication alone was not the equivalent of treatment in a state hospital where each patient had a treatment team of a psychiatrist, psychologist, nurse, social

worker, and psychiatric technician, and received both pharmacological and nonpharmacological treatment.  (*Mille, supra*, 182 Cal.App.4th at p. 648.)

The *Mille* court found a defendant must be transferred from the county jail to a state hospital within a reasonable time, determined in the context of the 90-day reporting requirement.  "Constitutional principles prohibit a defendant from being held 'more than the reasonable' period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.  [Citation.]  Therefore, when the court orders a defendant committed to a state mental hospital for treatment that will promote a defendant's 'speedy restoration to mental competence' (§ 1370, subd. (a)(1)(B)(i)), the court must also ensure that the defendant is actually transferred to the state hospital within a reasonable period of time."  (*Mille, supra*, 182 Cal.App.4th at p. 650.)

The *Mille* court declined " 'to attempt to prescribe arbitrary time limits' " for the transfer from the county jail to state hospital for treatment.  (*Mille, supra,* 182 Cal.App.4th at p. 649; see also *id*. at pp. 649-650.)  The court noted, however, that Mille filed his initial habeas petition 30 days after the order for his commitment, and the trial court denied it 49 days into the 90-day reporting period.  (*Id.* at p. 649.)  The court found the superior court should have granted the petition.  (*Ibid*.)  "[A] defendant needs sufficient time at the state mental hospital to be duly evaluated, potentially to derive some benefit from the prescribed treatment, and for such progress to be reported to the court." (*Id.* at p. 650.)

*The 2005 and 2006 Proceedings and the Osburn Order*

In the fall of 2005, the Public Defender filed a petition for a writ of habeas corpus on behalf of Osburn and three others.  The petition alleged petitioners were criminal defendants with pending cases who had been found IST.  The court had ordered each transferred to NSH.  Petitioners had been held at the county jail for months after the commitment orders.  Although Osburn had finally been transferred to NSH, the issue was

7

not moot because the three others were still held at the county jail and the issue of prolonged detention before transfer to a state hospital was an ongoing problem. The petition alleged the prolonged confinement in the county jail was an unlawful restraint on liberty, citing *Oregon Advocacy Center v. Mink* (9th Cir. 2003) 322 F.3d 1101 (*Mink*), in which the Ninth Circuit upheld an injunction mandating that incompetent criminal defendants be transferred to a state hospital within seven days of the commitment order.

The trial court issued an order to show cause to the Sheriff and set a shortened briefing schedule. The Sheriff's return alleged the delay in transfer was due to incomplete commitment orders, NSH's lengthy classification process, and the shortage of bed space. The Sheriff indicated the entire process for admission to a state hospital takes 60 to 90 days.

The court issued a supplemental order to show cause to permit the Attorney General and the Department of Mental Health (now the Department; see Stats. 2012, ch. 440) to respond. The court ordered the parties to brief issues concerning the availability of beds at NSH, alternatives if no beds were available, and whether the court should issue a permanent injunction requiring delivery of a defendant to NSH within seven days of the commitment order and that the Sheriff should return to court if unable to comply with the injunction. Subsequently, the court ordered an evidentiary hearing to determine what remedies, if any, should be ordered to alleviate the problem of delayed transfers to NSH.

Following the evidentiary hearing, the trial court issued a 65-page order, the Osburn Order. The Osburn Order first detailed the procedural background of the case and testimony received at the hearing. The court then made several findings of fact. Criminal defendants in Sacramento County who had been charged with a felony, found IST, and ordered committed to a state hospital pursuant to section 1370 "are being held in the Sacramento County Jail for months while awaiting transportation to a state hospital." These defendants were administered psychiatric medications in the jail, but received no

8

treatment toward restoration of competency. Under current policies, these defendants were to be transferred only to NSH, and only after an intake package (including more documentation than required by section 1370) had been received by NSH, the defendant had been placed on a waiting list, and a bed became available. In some cases, the delay was due to the delay of court personnel in compiling the intake package. There were no available local alternatives to the state hospital.

The court declined to find the matter moot, although all the petitioners had been transferred to the state hospital. The court found the matter to be one of broad public interest and likely to recur. The court found *Mink*, *supra*, 322 F.3d 1101 to be persuasive authority, and that the California statutory scheme was similar to that in Oregon. The court concluded, "It is abundantly clear that the constitutional rights of [section 1370] committees are being violated as each day passes and they remain in the Sacramento County Jail awaiting transfer to a state hospital." If this violation continued, "the result will be the constitutionally compelled release of such persons." The court found a remedy was required for the constitutional violation and a remedy similar to that in *Mink* was appropriate.

The court granted the petition for writ of habeas corpus, and ordered the Sheriff to deliver all section 1370 committees who had been committed to NSH more than seven days before and were still in the county jail to NSH within 60 days of the order. Thereafter, such deliveries were to occur within seven days of the order of commitment. NSH was ordered to accept delivery of these persons, to house them, and to provide treatment as required by section 1370.

The Department moved for reconsideration or clarification as to whether it was now required to accept section 1370 committees before it had received the 1370 packet, and whether it could send such persons to other state hospitals or facilities.

The trial court amended the Osburn Order to provide that the deadline for transfer to a state hospital would be extended if the 1370 packet had not been prepared. In that

9

case, the Sheriff was to deliver the defendant to the state hospital as soon as the 1370 packet was made available.  The court declined to amend the Osburn Order to permit the Department to transfer a section 1370 committee to another facility.  The statute required the court, not the Department, to designate the state hospital.

No appeal was taken from the Osburn Order.

*The 2013 Proceedings and Modification of Osburn Order*

On September 9, 2013, the Public Defender requested an order to show cause on behalf of Joseph Brewer and four other defendants as to why NSH should not be held in contempt for violating the Osburn Order by failing to accept petitioners after their 1370 packets were complete and more than seven days after their orders of commitment.  The Public Defender subsequently filed a similar order to show cause on behalf of seven other defendants.

In response, the Department moved to set aside the Osburn Order.  The Department argued that (1) it was no longer able to comply with the Osburn Order due to the increase in the number of defendants found IST, while the number of beds for such patients remained static; (2) because Sacramento County required transfer of these prisoners within seven days of the commitment order, the San Joaquin County Public Defender was now claiming a violation of equal protection based on the delays in transporting its similarly-situated prisoners; and (3) the Osburn Order was subject to question after *Mille, supra,* 182 Cal.App.4th 635.

The Department requested the court take judicial notice of charts showing the increase in section 1370 referrals, particularly from Sacramento County, and a report about a pilot program to treat in county jails those prisoners found IST.  A declaration from a Department staff psychiatrist stated that since 2010, the number of IST admittees had increased, and the number from Sacramento County was greater than from other counties of the same size.  Due to the Osburn Order, those committed in Sacramento County received preference in admission.  Although the Department had taken steps to

10

reduce the length of stay from admittance to discharge from an average of 180 days to an average of 60 days, NSH was unable to meet the 7-day deadline, or even a 30-day deadline. A declaration from the Department's Chief of Business Management confirmed that the Department could not guarantee a 30-day, let alone a 7-day, admission, and asked that the Osburn Order be set aside to permit uniform triage.

As to the request for an order to show cause for contempt, the trial court ordered the Department to provide documentary evidence by a certain date showing that all defendants had been transferred to and accepted by a state hospital. If the Department timely submitted the evidence, the matter would be moot and the order to show cause discharged; if the Department failed to timely submit the evidence, it would face a contempt finding.

The trial court declined to vacate the Osburn Order, but modified it to extend the seven-day period for delivery to a state hospital to 14 days. The court recognized the seven-day deadline in the Osburn order "may be unrealistic in light of the severe budget cuts suffered by a plethora of state agencies in the past few years. Nevertheless, this court remains firm in the stance that the Legislature and due process require delivery of [section 1370] committees, within a reasonable time frame as noted in *In re Mille* (2010) 182 Cal.App.4th 635." The court also added a provision to the Osburn Order requiring the Sheriff to notify the state hospital that an order has been made as soon as the Sheriff takes custody of the defendant upon order of commitment.

The Department appealed from this 2013 order modifying the Osburn Order but declining to set it aside.

## DISCUSSION

### I

### *Standard of Review*

The Osburn Order, in directing the Sheriff to deliver to the state hospital within a certain time period criminal defendants who have been committed to a state hospital after

11

having been found incompetent to stand trial, granted injunctive relief. "An injunction is statutorily defined to be 'a writ or order requiring a person to refrain from a particular act.' (Code Civ. Proc., § 525.) While the statute seems to limit that definition to prohibitory injunctions, an injunction may also be mandatory, i.e., may compel the performance of an affirmative act. [Citations.] In short, an injunction may be more completely defined as a writ or order commanding a person either to perform or to refrain from performing a particular act. [Citation.]" (*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1160.)

Accordingly, the Department's motion to set aside the Osburn Order was a motion to dissolve the injunction. "In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533; accord Civ. Code, § 3424, subd. (a) [grounds for modifying or dissolving "final" injunction].) An order refusing to dissolve an injunction is an appealable order. (Code Civ. Proc., § 904.1, subd. (a)(6).)

An order " ' "refusing to dissolve a permanent or preliminary injunction rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case" ' and 'will not be modified or dissolved on appeal except for an abuse of discretion.' " (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 850.)

II

*Trial Court's Authority to Issue the Osburn Order*

The Department contends the trial court lacked authority to issue the Osburn Order, offering several reasons why the court could not issue the order. We reject some

12

arguments and find the Department has forfeited others by failing to raise them in 2006 when the Osburn Order first issued.

First, in a cursory argument, the Department contends the trial court "acted in excess of its jurisdiction by inserting a 14-day deadline into [section 1370] in violation of the separation of powers doctrine." The Department argues the court acted in a legislative capacity by inserting any admission deadline into section 1370.

"Essentially, jurisdictional errors are of two types. 'Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' [Citation.] When a court lacks jurisdiction in a fundamental sense, an ensuing judgment is void, and 'thus vulnerable to direct or collateral attack at any time.' [Citation.]" (*People v. American Contractors Indem. Co*. (2004) 33 Cal.4th 653, 660 (*American Contractors*).) The phrase lack of jurisdiction "may also 'be applied to a case where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no "jurisdiction" (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites.' [Citation.] ' "[W]hen a statute authorizes [a] prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction." ' [Citation.] When a court has fundamental jurisdiction, but acts in excess of its jurisdiction, its act or judgment is merely voidable. [Citations.] That is, its act or judgment is valid until it is set aside, and a party may be precluded from setting it aside by 'principles of estoppel, disfavor of collateral attack or res judicata.' [Citation.] Errors which are merely in excess of jurisdiction should be challenged directly, for example by motion to vacate the judgment, or on appeal, and are generally not subject to collateral attack once the judgment is final unless 'unusual circumstances were present which prevented an earlier and more appropriate attack.' [Citations.]" (*Id.* at p. 661.)

The Osburn Order originally provided a seven-day deadline for transferring defendants to the state hospital. It is the imposition of a deadline--any deadline--that the Department attacks in this appeal, rather than the time period of the deadline; after all, the subsequent (2013) modification (to 14 days) is more favorable to the Department than was the original order. The Department's basic contention that the court lacks fundamental jurisdiction to impose any transfer deadline fails. As *Mille* teaches, section 1370 itself provides a deadline for transfer to a state hospital by requiring the medical director of the state hospital to provide a progress report to the court within 90 days of commitment. (§ 1370, subd. (b)(1).) To permit a meaningful progress report, the transfer must occur before the end of 90 days. *Mille* requires the transport of an IST defendant to a state hospital within a reasonable time; the reasonable time must be determined by reference to the 90-day report. (*Mille, supra,* 182 Cal.App.4th at p. 648.) In setting a deadline for transfer, a court is *not* rewriting or adding to the statute. Instead, the court is enforcing the statutory imperative for a meaningful progress report within 90 days of the commitment order. The court can do this only by "ensur[ing] that the defendant is actually transferred to the state hospital within a reasonable period of time." (*Id.* at p. 650.) Setting a deadline--establishing the outer limit of a reasonable time--does not violate the separation of powers doctrine. A court acts within its constitutional core function and does not violate the separation of powers doctrine when it interprets and applies existing laws and carries out the legislative purpose of statutes. (*Perez v. Roe I* (2006) 146 Cal.App.4th 171, 176-177.) That is all the transfer deadline does.

The Department contends the Osburn Order "is untethered to the unique circumstances and health needs of individual IST defendants." The Department's objection to a single deadline for transfer of all IST defendants is not a claim that the court exercised a power it did not legally possess. Instead, this contention objects to the *manner* in which the court exercised its power, by applying it to all IST defendants rather than specific defendants individually. Thus, the Department's argument is that the court

14

had no power " 'to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites.' " (*American Contractors, supra,* 33 Cal.4th at p. 661.)  The Department does not offer any "unusual circumstances" that "prevented an earlier and more appropriate attack" on the original Osburn Order and none are apparent.  The Department has forfeited its claim that the court's actions were in excess of its jurisdiction because it failed to raise it in a timely manner.  "Whereas a lack of fundamental jurisdiction may be raised at any time, a challenge to a ruling in excess of jurisdiction is subject to forfeiture if not timely asserted. [Citation.]" (*People v. Ramirez* (2008) 159 Cal.App.4th 1412, 1422.)

Second, the Department contends the Osburn Order "obviates established habeas procedures" by granting relief beyond the claims of petitioners and dispensing with briefing and hearing process by permitting immediate issuance of an order to show cause as to contempt.  We do not read the Department's contention to be a challenge to the court's fundamental jurisdiction to issue the Osburn Order.  If it is such a challenge, it fails.

"It is a well established rule that habeas corpus may be sought by one lawfully in custody for the purpose of vindicating rights to which he is entitled in confinement. [Citations.]" (*In re Jordan* (1972) 7 Cal.3d 930, 932.)  "Irrespective of mootness, a habeas corpus petition is 'an acceptable vehicle for a general declaration of the procedural rights of individuals detained' involving an issue of general public concern, particularly if it pertains to the administration of criminal justice. [Citation.]" (*In re Brindle* (1979) 91 Cal.App.3d 660, 675.)  "[A] trial court may grant habeas corpus petitioners 'prospective or class relief' to redress recurring deprivations of rights at correctional facilities. [Citing *Brindle.*]  The writ is thus an effective and versatile means by which to remedy persistent violations of prisoners' rights, and has been so used. [Citation.]" (*Mendoza v. County of Tulare* (1982) 128 Cal.App.3d 403, 420; see *In re Morales* (2013) 212 Cal.App.4th 1410 [writ of habeas corpus to enforce order prohibiting

15

preferential treatment to inmates on basis of ethnicity].)  The scope of the writ of habeas corpus has been expanded to include "use by one lawfully in custody to obtain a declaration and enforcement of rights in confinement."  (*In re Bittaker* (1997) 55 Cal.App.4th 1004, 1010.)

Third, the Department contends the Osburn Order is really a local rule and it was improperly promulgated, without the required notice, comment period, and adoption by the majority of the judges on the Sacramento Superior Court.  We disagree with the Department's characterization; as discussed *ante*, we find the Osburn Order to be an injunction, not a local rule.  In its reply brief, the Department agrees the Osburn Order "functions as an injunction."

III

*Grounds to Vacate Osburn Order/Dissolve Injunction*

As set forth *ante*, Code of Civil Procedure section 533 "articulates three independent bases on which a modification of an injunction may be predicated--(1) [material] change in the facts, (2) change in the law, or (3) ends of justice."  (*Luckett v. Panos* (2008) 161 Cal.App.4th 77, 85.)

A.  *Change in the Facts*

The Department sought to set aside the Osburn Order, in part, due to a change of facts:  the increased number of defendants committed under section 1370, the lack of new beds to accommodate the increase, and budget constraints.  The trial court accepted that the state agencies' budgets had been further constrained and modified the Osburn Order accordingly.  *On appeal*, the Department does not contend that the modification is insufficient to address the changed facts, or that the change of facts requires that the Osburn Order be set aside and the trial court's failure to do so was an abuse of discretion.  Because the Department does not raise this issue on appeal, it has abandoned the issue.  (*Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811 [issues not raised in an appellate brief are deemed abandoned].)

16

B. *Change in Law*

1. The *Mille* Decision

The Department contends the amended Osburn Order violates *Mille, supra,* 182 Cal.App.4th 635, a decision filed four years after the original Osburn Order. The Department contends the 14-day deadline contradicts *Mille'*s "reasonable period of time" standard. The Department focuses on the need for discretion to determine the admission date on a patient-by-patient basis, citing the time needed to evaluate the patient's security risk, to review the 1370 packet, and to comply with population caps at certain state hospitals. The *Mille* decision, however, did not discuss any of these concerns. Instead, it focused solely on the progress report that must be issued within 90 days of the order of commitment. (§ 1370, subd. (b)(1).) "For all of this to occur, a defendant needs *sufficient time at the state mental hospital* to be duly evaluated, potentially to derive some benefit from the prescribed treatment, and for such progress to be reported to the court." (*Mille,* at p. 650, italics added.) The *Mille* court was concerned with the period of time within which the defendant must be evaluated while at the state hospital, not the time the Department needed to secure his admission thereto.

In issuing the Osburn Order, the trial court determined the "reasonable period of time" was seven days, later modified to 14 days. In this regard, the Osburn Order fulfills the mandate of *Mille* that the trial court "ensure that the defendant is actually transferred to the state hospital within a reasonable period of time." (*Mille, supra,* 182 Cal.App.4th at p. 650.) While the Department could have challenged the original seven-day order as unreasonable, it did not. The Department does not explain why 14 days is now unreasonable where seven days was not. Nothing in *Mille* changes the law so as to classify the trial court's refusal to dissolve the Osburn Order as an abuse of discretion.

2. Amendments to Section 1370

In 2014, the Governor signed Assembly Bill No. 1468 (2013-2014 Reg. Sess.) June 20, 2014 (Assembly Bill 1468), an urgency measure that amended section 1370 and

17

other statutes.  (Stats. 2014, ch. 26 (Assem. Bill 1468), eff. June 20, 2014.)  We requested supplemental briefing from the parties as to the effect, if any, of these amendments on this case.  Both parties agree that Assembly Bill 1468 made changes that affect the Osburn Order, but without specifically addressing the timeframe for transferring an IST defendant to a state hospital.

Assembly Bill 1468 is a lengthy budget bill relating to public safety.  As pertinent to this case, the bill made changes that affect the commitment of IST defendants to a state hospital.  The Legislative Counsel's Digest summarized these changes:  "This bill would repeal the provision requiring the court to select the state hospital in accordance with the policies established by the [Department] when directing that the defendant be confined in a state hospital.  The bill would instead require, prior to admission to the [Department], the [D]epartment to evaluate each patient committed pursuant to specified provisions of law to determine the placement of the patient to the appropriate state hospital.  The bill would also require a court that orders that a defendant be committed to the [Department] or other public or private treatment facility to provide copies of any medical records with the documents described above prior to the admission of the defendant to the [D]epartment or other treatment facility where the defendant is to be committed.  The bill would require the [D]epartment to utilize specified documents, including those described above and any medical records, to make the appropriate placement.  The bill would make conforming changes."  (Legis. Counsel's Dig., Assem. Bill 1468, Stats. 2014, ch. 26.)

Under the former version of section 1370, the trial court selected the state hospital to which the IST defendant was committed.  "When directing that the defendant be confined in a state hospital pursuant to this subdivision, the court shall select the hospital in accordance with the policies established by the [Department]."  (Former § 1370, subd. (a)(5); Stats. 2012, ch. 24, § 27.)  Now, under Assembly Bill 1468, the court commits the defendant to the Department, which selects the placement location.  (§ 1370, subd. (a)(5).)  Assembly Bill 1468 amended Welfare and Institutions Code section 7228, which

18

now provides: "Prior to admission, the [Department] shall evaluate each patient committed pursuant to Section 1026 or 1370 of the Penal Code to determine the placement of the patient to the appropriate state hospital. The [Department] shall utilize the documents provided pursuant to subdivision (e) of Section 1026 of the Penal Code and paragraph (2) of subdivision (b) of Section 1370 of the Penal Code to make the appropriate placement. A patient determined to be a high security risk shall be treated in the [D]epartment's most secure facilities pursuant to Section 7230. A Penal Code patient not needing this level of security shall be treated as near to the patient's community as possible if an appropriate treatment program is available."

Another change affected by Assembly Bill 1468 is that the 1370 packet must now to be sent to the Department *prior* to the defendant's admission. (§ 1370, subd. (a)(3).) Previously, the documents "shall be taken *with the defendant* to the state hospital or other treatment facility where the defendant is to be confined." (Former § 1370, subd. (a)(3); Stats. 2012, ch. 24, § 27, italics added.)

Both of these changes in the law affect the Osburn Order. The Osburn Order directs the Sheriff to deliver the defendant to the state hospital designated in the commitment order. But the commitment order will no longer designate the state hospital. The Osburn Order also requires the Sheriff to deliver the defendant within 14 days of the commitment order or as soon as the 1370 packet is available. Now the law requires that the 1370 packet be sent to the Department *prior to* the defendant's admission. These provisions of the Osburn Order are no longer valid.

While Brewer contends the Osburn Order remains valid if the invalidated provisions are changed to conform to Assembly Bill 1468, the Department counters that Assembly Bill 1468 demonstrates the legislative intent to vest the Department with discretion in the admission of IST defendants to state hospitals, and the Osburn Order improperly infringes upon that discretion and therefore must be overturned.

In response to Assembly Bill 1468, the trial court issued an order modifying the amended Osburn Order. This modification requires the Sheriff to deliver a defendant committed under section 1370 to the state hospital designated by the Department within 14 days of the commitment order unless the 1370 packet has not been prepared, in which case the sheriff shall deliver the defendant to the state hospital as soon as the 1370 packet is made available. We requested supplemental briefing from the parties as to whether the trial court retained jurisdiction to issue this modification and, assuming the modification is valid, its effect on the parties' respective positions in this case. The parties disagree as to the trial court's jurisdiction to issue the modification, but agree the modification did not change their positions.

We find the trial court lacked jurisdiction to issue the modification so it is void. As discussed *ante*, we view the Osburn Order as an injunction and the Department's motion to set aside the Osburn Order as a motion to dissolve the injunction. The trial court's 2013 order denied the Department's motion, but amended the Osburn Order. That 2013 order is the subject of this appeal. "The trial court's power to enforce, vacate or modify an appealed judgment or order is suspended while the appeal is pending. [Citations.]" (*Elsea v. Saberi* (1992) 4 Cal.App.4th 625, 629, cited with approval in *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189-190.) "[T]he perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby . . ." (Code Civ. Proc., § 916, subd. (a).)

We find Assembly Bill 1468 may have a greater effect on the Osburn Order than simply the changes discussed *ante*. These changes in the law may also affect the reasonableness of a mandatory 14-day deadline for transfer to the state hospital after the commitment order. The Department now has additional duties to perform before admission of a defendant to a state hospital, including selecting the most appropriate hospital or treatment facility for restorative treatment after review of the 1370 packet and

20

other documents.  Compilation of the 1370 packet may take additional time as it now must include the defendant's medical records.  (§ 1370, subd. (a)(3)(I).)  The trial court must carefully consider whether the 14-day deadline is reasonable in light of these additional duties.

Indeed, given the additional individualized assessment now required after the Department receives the 1370 packet, the trial court must determine not only whether a short 14-day deadline from the date of the commitment order is reasonable, but also whether *any* deadline should be triggered by the commitment order or by the Department's receipt of the 1370 packet.  The trial court must hold a new evidentiary hearing to ascertain how much time is reasonable, after the 1370 packet is prepared and sent to the Department, to accommodate both the Department's duties prior to delivering IST defendants to the designated hospital or other treatment facility and the statutory requirement of a progress report from such hospital or facility within 90 days of commitment.  (§ 1370, subd. (b)(1).)

A material change in the law, Assembly Bill 1468, which was not before the trial court, requires reconsideration of the Department's motion to set aside the Osburn Order.  The change in the law requires, at the very least, additional modifications to the Osburn Order.  We shall direct the trial court to vacate its order denying the motion to set aside the Osburn Order and we remand for reconsideration of that motion with an evidentiary hearing and any further proceedings the trial court determines necessary or appropriate.  We shall dissolve the injunction currently in place in the form of the Osburn Order pending ruling on reconsideration of the motion to set aside.

Given our disposition of this action, we do not address the Department's contention that the Osburn Order has exposed the Department to lawsuits from criminal defendants in other counties claiming a violation of equal protection.  We deny the Department's related request for judicial notice of orders from other counties establishing timeframes for the transfer of criminal defendants found incompetent to stand trial

21

because such documents are unnecessary to our resolution of this appeal.  (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

## DISPOSITION

The trial court's order denying the motion to set aside the Osburn Order (dissolve the injunction) is reversed.  The matter is remanded to the trial court with directions to reconsider the Department's motion to set aside the Osburn Order, in light of the changes to the law in Assembly Bill 1468.  Pending resolution of the reconsideration of the Department's motion, the injunction is dissolved.

                                                         DUARTE          , J.

I concur:

      BUTZ          , J.

Nicholson, Acting P. J., Concurring and Dissenting.

I concur in the majority's conclusion that the permanent injunction must be dissolved. I also concur in the majority's conclusion that the superior court's attempt to modify the permanent injunction after the notice of appeal was filed is void. I respectfully dissent, however, as to what is to be done on remand. In my opinion, the law does not allow the superior court to craft a new permanent injunction, but instead requires the court to decide each defendant's petition for writ of habeas corpus on its own unique facts.

I

*Due Process Rights of Defendants Found Incompetent to Stand Trial*

A.    *Jackson*

The constitution protects defendants found incompetent to stand trial (IST defendants) from being confined indefinitely. (*Jackson v. Indiana* (1972) 406 U.S. 715, 738-739 [32 L.Ed.2d 435, 451] (*Jackson*).) The *Jackson* court held that, as a matter of due process, "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." (*Id*. at p. 738.) The court, however, cautioned: "In light of differing state facilities and procedures and a lack of evidence in this record, we do not think it appropriate for us to attempt to prescribe arbitrary time limits. We note, however, that petitioner Jackson has now been confined for three and one-half years on a record that sufficiently establishes the lack of a substantial probability that he will ever be able to participate fully in a trial." (*Id*. at pp. 738-739.)

1

B.    *Davis*

The California Supreme Court followed the lead of the *Jackson* court and held that "no person charged with a criminal offense and committed to a state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future." (*In re Davis* (1973) 8 Cal.3d 798, 801 (*Davis*).)  Concerning the specific defendants in *Davis*, the court wrote:  "[P]etitioners are not entitled to immediate release from confinement for they have not established, nor do they allege, either that they are now competent to stand trial or that no substantial likelihood exists that they will soon recover their competence.  On the other hand, petitioners are entitled, under *Jackson*, to a prompt determination by state hospital authorities regarding the probability of their ultimate recovery . . . ." (*Id*. at p. 803.)

Applying the due process principles discussed in *Jackson* to California's procedure, the *Davis* court directed:  "With respect to future commitments, we think that in order to comply with *Jackson*'s demands the trial courts should henceforth direct the appropriate state hospital authorities to commence an immediate examination of the person committed and, within a reasonable time, report to the court the result of that examination and estimate the additional time probably necessary to restore the person to competence.  Should the person committed desire to challenge the report's conclusions, reasonable opportunity should be provided him to do so." (*Davis, supra,* 8 Cal.3d at p. 806, fns. omitted.)

Concerning the defendants at issue in *Davis*, the court ordered the Department of Mental Health (now the State Department of State Hospitals) "to report without undue delay to the appropriate superior courts regarding the progress, if any, achieved by the

2

petitioners in their respective care, and their prognosis as to the future."**1** (*Davis, supra,* 8 Cal.3d at p. 810.) Notably, the *Davis* court did not set an arbitrary deadline applicable to all defendants.

C.      *Mink*

In 2003, the Ninth Circuit of the United States Court of Appeals decided that IST defendants in Oregon had a constitutional due process right to be transferred from county jail to the state hospital for treatment in a timely manner. (*Oregon Advocacy Center v. Mink* (9th Cir. 2003) 322 F.3d 1101, 1119-1123 (*Mink*).) In *Mink*, the federal district court found the due process rights of IST defendants were being violated because they were not being promptly transferred to the state hospital. It therefore imposed an injunction, applicable statewide, requiring the state hospital to admit IST defendants within seven days after the determination of incompetence had been made. (*Id*. at pp. 1107 & 1122, fn. 13.) The district court based the seven-day deadline on an Oregon statute. That statute provided: "When a court determines that a defendant lacks fitness to proceed and commits the defendant to the custody of the [state hospital], the defendant shall be transported to the hospital . . . as soon as practicable. Transport shall be completed within seven days after the court's determination unless doing so would jeopardize the health or safety of the defendant or others. . . ." (Or. Rev. Stat. former § 161.370(3) (1999).) Because the legislature had chosen the seven-day time limit, the *Mink* court rejected the state hospital's argument that the time limit was an abuse of discretion. (*Mink, supra,* at p. 1122, fn. 13.)

D.      *Mille*

In 2010, the Court of Appeal (Division Three of the Second Appellate District) discussed the application of Penal Code section 1370 and constitutional due process in *In*

---

**1**      Hereafter, I refer to the State Department of State Hospitals as "the Department."

3

*re Mille* (2010) 182 Cal.App.4th 635 (*Mille*). In that case, an IST defendant filed a petition for writ of habeas corpus in the trial court because he had not yet been transported to the Department 30 days after he was committed under Penal Code section 1370. The court denied the petition, finding no due process violation. (*Id.* at p. 640.) The defendant refiled the petition in the Court of Appeal, where it was denied summarily, but the Supreme Court granted review and transferred the case back to the Court of Appeal to determine whether the defendant's due process rights had been violated even though the case had become moot because the defendant had been transported to the Department. (*Id.* at pp. 640-641.)

On remand, the Court of Appeal held that the deadline for transporting the defendant to the Department, consistent with due process, was subject to the "basic premise" that the defendant could not be held for more than a reasonable period of time as discussed in *Jackson* and *Davis*. The court wrote that "[w]hat constitutes a reasonable length of time will vary with the context," and, citing *Jackson*'s caution that it should not attempt to prescribe arbitrary time limits, it concluded the trial court should have ordered the sheriff to deliver the defendant to the state hospital when the defendant filed his petition for writ of habeas corpus 30 days after the commitment order. (*Mille, supra,* 182 Cal.App.4th at pp. 649-650.) "[T]he court must also ensure that the defendant is actually transferred to the state hospital within a reasonable period of time." (*Id.* at p. 650.)

The *Mille* court did not cite or discuss *Mink*.

When the trial court in this case made its 2013 order, *Mille* was binding precedent. "Decisions of every division of the District Courts of Appeal are binding upon all the justice and municipal courts and upon all the superior courts of this state, and this is so whether or not the superior court is acting as a trial or appellate court. Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction." (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

4

E.      Current Statutory Scheme in California

In its current form, Penal Code section 1370 gives the Department 90 days after commitment to report to the superior court on whether an IST defendant has regained competence or is substantially likely to regain competence in the foreseeable future. (Pen. Code, § 1370, subd. (b)(1).)  The California Legislature has enacted no statute like the one in Oregon requiring delivery of a defendant to the Department within a specific number of days after the order of commitment.

II

*The Proceedings*

In 2006, the Sacramento County Superior Court imposed an "Order Granting Habeas Corpus" in the case of four IST defendants whose delivery to the Department for evaluations had been improperly delayed.  The court held an evidentiary hearing concerning not just the status of the defendants at issue but of the circumstances of the county jails and Department, such as availability of beds and treatment options for IST defendants.  The court's order summarized the testimony and quoted much of *Mink*.

In its 2006 order, the superior court found that IST defendants were being held in county jail for months while waiting for transportation to the Department; they received psychiatric medications in county jail but did not receive treatment toward restoring competency; under policies then in place IST defendants were to be transported to Napa State Hospital (and there was no alternative); and, in some cases, the court delayed in providing the intake packet required by Penal Code section 1370.  The Sacramento County Sheriff (sheriff) was not transporting these defendants to Napa State Hospital because Napa State Hospital had informed the sheriff that no beds were available.

Holding that it was "abundantly clear that the constitutional rights of felony Penal Code § 1370 committees are being violated as each day passes and they remain in the Sacramento County Jail awaiting transfer to a state hospital," the court directed the

5

sheriff to "deliver to Napa State Hospital all felony Penal Code § 1370 committees ordered committed to Napa State Hospital pursuant to that statute, within seven days of the order of commitment" and directed Napa State Hospital to "accept delivery of those Penal Code § 1370 committees, house them, and give them treatment . . . ."

The Department sought clarification of the order. In doing so, the Department reminded the court that (1) the court must prepare the intake packets before the defendants could be admitted to the Department and (2) the court failed to provide intake packets for some defendants months after the order of commitment. In response to the motion, the superior court changed its order. Instead of ordering transportation to Napa State Hospital within seven days after commitment, the court ordered the sheriff to deliver IST defendants to Napa State Hospital "within seven days of the order of commitment, unless the defendant's intake package . . . has not been prepared, in which case the Sheriff shall deliver the defendant to the designated state hospital as soon as the package is made available."

The Department did not appeal.

Contempt proceedings were initiated against the Department in 2013 for failure to accept IST defendants within the time provided in the court's 2006 order. The Department responded by asking the superior court to dissolve the permanent injunction imposed by the 2006 order because changed circumstances had rendered the Department unable to comply with the order.

In support of its motion to dissolve the injunction and in opposition to the order to show cause, the Department submitted a request for judicial notice, including similar actions in other superior courts. In Yolo County, for example, the superior court has ordered the Department to admit IST defendants within 30 days after the commitment order. The Department also filed declarations informing the court of increases each year in admissions of IST defendants while, at the same time, the number of beds did not increase. As a result of the 2006 order, defendants from Sacramento County gained

6

preference for admission to the Department over defendants from other counties. Additionally, Sacramento County has three to five times more IST defendants than other Northern California counties of similar population, indicating a possible problem in court-appointed trial competency evaluations. Because of the lack of resources, the Department was unable to comply with the 2006 order.

The Department argued that the superior court could not hold the Department in contempt because it did not have the ability to comply with the order, and the Department asked the court to discharge the order to show cause. (See *In re Jones* (1975) 47 Cal.App.3d 879, 881 [ability to comply an element of valid contempt judgment].)

The superior court ordered the Department to provide evidence that the defendants named in the contempt proceeding had been delivered to the Department. While the court did not dissolve the permanent injunction, it found that circumstances had changed, requiring a change in the injunction. It wrote:

"With regard to [the Department's] motion to vacate [the 2006 order], the court recognizes the future needs of the Department of State Hospitals to have uniformity of accepting transferred Penal Code § 1370 committees to the state hospitals within a timely fashion, and that the seven-day deadline set forth in the [2006 order] may be unrealistic in light of the severe budget cuts suffered in a plethora of state agencies in the past few years. Nevertheless, this court remains firm in its stance that the Legislature and due process require prompt delivery of Penal Code § 1370 committees, within a reasonable period of time as noted in In re Mille (2010) 182 Cal.App.4th 635. The parties should be aware that the [2006 order] requires delivery within either seven days or immediately upon preparation of the Penal Code § 1370 intake package if not prepared within the seven-day period. There is no seven-day period allowed following preparation of the Penal Code § 1370 intake package, if it is not prepared in the initial seven-day period.

"In light of the concerns voiced by [the Department] at the hearing, the court will now modify its [2006 order] to extend the seven-day period to instead be a 14-day period,

which should be sufficient to allow the Department to not only realistically meet this deadline for the Sacramento defendants committed under Penal Code § 1370, but also on a statewide basis."

This time, the Department appealed.

Despite the notice of appeal and the superior court's resulting loss of jurisdiction over the permanent injunction, the superior court has continued to tinker with the permanent injunction, as noted in the majority opinion.

### III

*Change in Circumstances Permitting Dissolution or Modification*

The majority declines to consider the legal merit of the superior court's original injunction because (1) the Department did not appeal the order and (2) there was no change of facts or law between the 2006 order and the 2013 petition to find the Department in contempt. The former is true – there was no appeal – but the latter is not. In the superior court, the Department asserted there had been a change of facts and law, and the superior court so found, thus justifying its modification of the permanent injunction. At oral argument on appeal, the parties agreed that there had been a change of facts allowing the superior court to modify the permanent injunction.

The law allows dissolution or modification of a permanent injunction if there is a material change in the facts or law relating to the injunction or if the ends of justice would be served by dissolution or modification.[2] (Code Civ. Proc., § 533.) In justifying its own modification of the permanent injunction, the superior court found a material

---

[2] "In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

8

change of facts – that is, the fiscal shortages in the past few years have made it impossible for the Department to admit IST defendants within seven days after commitment.

On appeal, neither party argues that there was no material change of facts or law. That leaves the superior court's finding that there was a material change unchallenged. Incongruously, however, the majority turns this absence of argument into a forfeiture of the issue by the Department. The logic of this position escapes me. The Department does not assert, either explicitly or implicitly, that the superior court erred by finding a change in the material facts. And there is no requirement in reason or law for the Department to raise or contest that settled issue on appeal.

In addition to the facts, the law relating to the 2006 order changed materially when Division Three of the Second Appellate District decided *Mille*, which became precedent, binding on the superior court in this case. I explain below, regarding the merits of the 2013 order, why I believe the *Mille* decision represents a change in the law requiring dissolution of the 2013 order.[3]

Therefore, my view of what is in play in this appeal departs from the majority's view. I would conclude that there was a material change in the facts and law relating to the 2006 order. Because the Department agreed with superior court that there was a change, at least in the material facts, there was no need to spend its appellate resources in establishing that condition for dissolution or modification of the 2006 order. Consequently, the Department did not forfeit a challenge of the 2013 order, and we must determine whether the superior court abused its discretion in denying the motion to dissolve the permanent injunction.

---

[3] While it is unnecessary to go so far, I would also conclude that the ends of justice require modifying or dissolving the permanent injunction because of the widespread, detrimental effect the injunction has had, as described below. (Code Civ. Proc., § 533.)

9

IV

*The Merits of the Permanent Injunction as Imposed in 2013*

On the merits, I would find that the superior court abused its discretion in denying the motion to dissolve the permanent injunction. Neither the injunction as originally ordered in 2006 nor the modified injunction ordered in 2013 properly, or even rationally, protects the constitutional rights of IST defendants.

The standard for reviewing the denial of a motion to dissolve an injunction is abuse of discretion. " ' "It is a rule so universally followed and so often stated as to need only to be referred to that the granting, denial, dissolving or refusing to dissolve a permanent or preliminary injunction rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case" ' and 'will not be modified or dissolved on appeal except for an abuse of discretion.' [Citation.]" (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 849-850.)

Applying the abuse of discretion standard, I would conclude that the permanent injunction is arbitrary and capricious because: (1) it is unhinged from constitutional due process doctrine and inconsistent with precedent binding on the superior court, (2) it ignores the rights of IST defendants when the superior court fails to prepare the intake packet, and (3) it forces the Department to give defendants from Sacramento County, but one of 58 counties, preference when resources are limited.

A. Constitutional Due Process

At the time the superior court made its 2013 order, Penal Code section 1370, subdivision (b)(1) provided: "Within 90 days of a commitment made pursuant to subdivision (a), the medical director of the state hospital or other treatment facility to which the defendant is confined shall make a written report to the court . . . ." (Stats. 2012, ch. 24, § 27.) It did not, and still does not, provide a time limit for transporting the IST defendant from the county jail to wherever the defendant will go for evaluation and preparation of the report to the court and for treatment to restore capacity.

10

Because there is no statutory right to be transported to the Department within 14 days after the superior court orders commitment, the only theoretical basis for the 2006 and 2013 orders is the constitutional right to be free of unlawful restraint on liberty, a due process right. The superior court's 2006 order was that all IST defendants must be delivered to the Department within seven days after the order of commitment. The necessary conclusion is that, in 2006, the superior court believed that the constitutional due process rights of those committed were violated when they were not delivered to the Department within seven days. By 2013, those constitutional rights had changed, in the superior court's view, because the rights would not be violated unless it took more than 14 days to deliver the defendant to the Department. The only reason the superior court gave for the change was the Department's shortage of resources.**4**

The actual constitutional requirement on these matters is quoted in *Mille, supra,* 182 Cal.App.4th at page 638:

"A 'person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial *cannot be held more than the reasonable period of time* necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.' [Citations to *Jackson* and *Davis*.]" (*Mille, supra*, 182 Cal.App.4th at p. 638, original italics.)

The "reasonable period of time" applies to the whole process to "determine whether there is a substantial probability" that the defendant will soon have capacity to stand trial. Therefore, the 2013 order was arbitrary, as proved by the court itself when it modified the 2006 order for no reason other than lack of agency resources. The 2013

---

**4** The modification from seven days to 14 days raises the question, unanswered by the superior court, whether constitutional due process rights are dependent on an agency's resources. I doubt it.

11

order also assumes that every case is substantially the same. This is the type of uniform but arbitrary time limit rejected in *Jackson, supra,* 406 U.S. at page 738.

The majority credits the 2006 and 2013 orders as being consistent with *Mille's* holding that constitutional due process requires an IST defendant to be transported to the Department "within a reasonable period of time." (*Mille, supra,* 182 Cal.App.4th at p. 650.) The majority concludes: "Nothing in *Mille* changes the law so as to classify the trial court's refusal to dissolve the Osburn Order as an abuse of discretion." (Maj. opn., *ante*, at p. 17.)

This view that the 2006 and 2013 orders are "consistent" with *Mille* misses the point.[5] *Mille* dealt with what constitutional due process requires, which is transfer to the Department and evaluation within a "reasonable period of time," a period that "will vary with the context." (*Mille, supra,* 182 Cal.App.4th at p. 649.) In other words, constitutional due process does not prescribe a set number of days to be applied in every instance.

Reliance on *Mink* for a seven-day or 14-day rule is particularly irrational. In that case, the federal courts (trial and appellate) concluded, based on an Oregon statute requiring delivery of an IST defendant to the state hospital within seven days, that IST defendants in that state had a due process right to be delivered within seven days. Applying *Mink* here effectively bases California IST defendants' due process rights on an Oregon statute. We are not bound by the decisions of the Ninth Circuit Court of Appeals, even on constitutional issues. (*People v. Bradley* (1969) 1 Cal.3d 80, 86.) And in this

---

[5]    If we were reviewing legislation requiring transfer of a defendant found incompetent to stand trial within 14 days after commitment, we would approach the question of its validity differently and would uphold it unless it was inconsistent with due process rights. That approach would be required because of the legislative powers involved. Here, on the other hand, the superior court has no such legislative powers and can impose only what the statutes and constitution require.

12

case there are good reasons not to follow *Mink* which is state-specific and code-specific in its analysis and remedy.

Because the 2013 order is unhinged from the requirements of constitutional due process, which is the only basis for the order, I would conclude that it is arbitrary and capricious and, thus, an abuse of discretion. Beyond the precedential dimensions of the order, however, there are additional reasons to conclude that it was an abuse of discretion.

B.     Intake Packets and Impossible Burdens

While the 2013 order imposes a duty on the Department to accept an IST defendant within 14 days after the commitment order, there is a gaping hole in the order that potentially allows a defendant to languish in county jail long after any reasonable period of time to transfer the defendant to the Department has expired. That gaping hole is the exception that there is no duty to transfer an IST defendant unless the superior court gives the Department an intake packet. In this case, for example, it took the superior court 42 days to deliver the packet for one of the IST defendants to the Department.

The 2013 order also imposes an impossible burden on the sheriff. If, outside the initial 14-day period, the court prepares an intake packet and makes it available to the Department, the sheriff is in violation of the order as soon as the Department receives the packet. The problem is that the sheriff cannot transport the IST defendant until the Department tells the sheriff where to transport the defendant, and the Department cannot determine where to place the defendant until the superior court provides the packet and the Department has a reasonable opportunity to assess the packet and select a facility for the IST defendant.

These are problems that may be susceptible to legislative resolution, applicable to all cases, but the superior court is not equipped to foresee all the eventualities and provide an all-inclusive remedy. This is evident from the superior court's ongoing tweaking of the permanent injunction.

13

The judicial remedy imposed by the 2013 order and its permanent injunction is broadly applicable to Sacramento County IST defendants, but poorly focused. That is like prescribing aspirin to treat every illness. It may be helpful in some cases, but it may be harmful in others. In any event, it is no way to run a clinic. The problem of failure to transfer any particular IST defendant to the Department within a reasonable period of time should be addressed in individual petitions for writ of habeas corpus. In those proceedings, the court can consider the specific needs of the defendant and the legislative requirement that the Department report back to the superior court within 90 days after commitment, as well as any other considerations that affect the due process rights of the defendant. Such defendants are not without a remedy if the 2013 permanent injunction is dissolved.

C.      Preference for Sacramento County Defendants

Finally, the order pertains only to a relatively small fraction of statewide IST defendants. It applies only to Sacramento County IST defendants.

The Chief of Business Management for the Department said in his declaration: "Setting aside the *Osburn* order, as well as the [Yolo County] order, will enable [the Department] to apply a uniform triage process for the equitable admission of IST [defendants] referred from counties."

A staff psychiatrist at the Department said in her declaration: "Because Sacramento has a seven-day transfer timeline for its IST patients, Sacramento IST patients are admitted before IST patients from counties without such orders and those IST patients from other counties must wait longer (sometimes months longer) for admission."

There is no rational or constitutional justification for affording Sacramento County's IST defendants preference over defendants from other counties. Indeed, the effect of doing so is to encourage other superior courts, like Yolo County, to impose their own arbitrary orders on the beleaguered Department. Chaos ensues.

14

# V

## *Appropriate Remedy*

The appropriate remedy for the general problem lies in the legislative and administrative processes of the state and its counties, not in the courts. As the experience with the superior court's 2006 and 2013 orders has shown, any general remedy from the courts will be arbitrary and uneven.

That is not to say that the superior court is powerless to provide remedies for actual due process violations. The writ of habeas corpus is available to contest an unlawful restraint on liberty.

"Although in form the Great Writ is simply a mode of procedure, its history is inextricably intertwined with the growth of fundamental rights of personal liberty. For its function has been to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints. Its root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release." (*Fay v. Noia* (1963) 372 U.S. 391, 401-402 [9 L.Ed.2d 837, 846-847].)

Two last matters bear mentioning. First, the superior court's permanent injunction is not a habeas corpus proceeding as to each IST defendant. Therefore, the only way to enforce the order is by contempt proceedings. But the Department cannot be held in contempt if it is unable to comply with the permanent injunction. (See *In re Jones, supra,* 47 Cal.App.3d at p. 881.) And second, in habeas corpus proceedings IST defendants cannot be released based on a violation of due process rights unless they establish that (1) they have been held more than the reasonable period of time necessary to determine whether there is a substantial probability that they will attain the capacity to stand trial in the foreseeable future or (2) their continued commitment is not justified by

15

progress toward that goal.  (*Davis, supra,* 8 Cal.3d at pp. 801, 804; *Jackson, supra,* 406 U.S. at p. 738.)  Violation of a permanent injunction does not establish a constitutional violation requiring release.

Here, it was an abuse of discretion to do anything other than to dissolve the injunction because it imposes arbitrary deadlines under the guise of constitutional compulsion.  I would dissolve the 2013 order imposing a permanent injunction and remand for individual habeas corpus proceedings.


          NICHOLSON     , Acting P. J.